IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

| |  |
|---|---|
| WILLIAM J. CLARK, JR.,<br><br>                    Petitioner,<br><br>vs.<br><br>SANDRA DOLCE, Superintendent,<br>Orleans Correctional Facility,[1]<br><br>                    Respondent. | No. 9:11-cv-00893-JKS<br><br>MEMORANDUM DECISION |

       William J. Clark, Jr., a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Clark is in the custody of the New York State Department of Corrections and Community Supervision and is incarcerated at Orleans Correctional Facility. Respondent has answered, and Clark has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

       The Appellate Division recounted the facts of this case as follows:

       In October 2006, [Clark] was convicted of numerous crimes, including stalking in the third degree, arising out of his harassment of the victim, his former girlfriend. Thereafter, County Court issued an order of protection directing [Clark] to stay away from her home and place of employment, and refrain from all contact with her. The present case involves [Clark's] almost immediate disregard of that order and his ongoing campaign of harassment and intimidation of the victim.
       According to the victim, on December 8, 2006, [Clark]—acting in violation of the order of protection—placed a letter on her car windshield while she was at work and telephoned her six times, with one conversation ensuing. On December 11, 2006, [Clark] reached the victim twice by telephone, during which time he related details of the victim's recent activities and demanded intimate information about her relationship with

---

      [1]     Sandra Dolce, Superintendent, Orleans Correctional Facility, is substituted for Jeff McKoy, former Superintendent, Greene Correctional Facility. FED. R. CIV. P. 25(c).

1

another man. The first telephone call ended when the victim hung up and, during the second call, [Clark] warned the victim not to hang up on him again. Nevertheless, the victim advised [Clark] in no uncertain terms that she wanted to be left alone and that he was violating the order of protection, and she promptly reported the contact to law enforcement officials.

[Clark] next accosted the victim at a gas station four days later, on December 15, 2006. The victim agreed to speak to him in order to tell him face-to-face that she wanted to be left alone. As the victim sat in her locked car with her window cracked open, [Clark] indicated again that he was aware of the details of her recent activities, as well as the activities of her family, revealing that he had improperly obtained private and confidential information about her father's finances. The victim reported the incident to law enforcement officials on the following business day.

On December 26, 2006, [Clark] made two more telephone calls to the victim, who again told him that he was violating the order of protection and that she wanted to be left alone. More disturbingly, when the victim arrived at work that same night, [Clark] ran up to her car and began screaming and pounding on the driver's side window, demanding to know how she could "do this to" him. It was dark outside at the time, and [Clark] was wearing dark clothes and a dark hat. The victim called 911 on her cell phone and frantically shouted to a coworker for help, and [Clark] fled before police arrived.

A few days after that encounter, the victim entered a locked house into which she was planning to move and discovered various items allegedly left by [Clark] for her in the kitchen. Among other things, [Clark] had allegedly left a gift card purchased in the store where the victim worked—the same store at which he had pounded on her car window on December 26, 2006, as she arrived for work. Subsequently, a number of documents were discovered in [Clark's] residence that belonged to the victim or her family, and were obtained either from inside the victim's home and workplace or from the garbage outside of those locations. [Clark] also had a list of the names, addresses and telephone numbers of the victim and her family members, as well as photographs of the victim in which her head had been cut out.

[Clark] was thereafter charged in an indictment with numerous counts relating to the above incidents. Following a jury trial, during which [Clark] represented himself, he was convicted of six counts of criminal contempt in the first degree, one count of stalking in the second degree and six counts of criminal contempt in the second degree. [Clark] was sentenced as a second felony offender to an aggregate prison term of 8 to 16 years.

*People v. Clark*, 883 N.Y.S.2d 824, 825-26 (N.Y. App. Div. Aug. 13, 2009) (citation and footnote omitted).

Through counsel, Clark directly appealed, arguing that: 1) the evidence was insufficient to support all of his convictions; 2) the prosecutor committed misconduct in commenting on

Clark's refusal to take the stand; and 3) the sentence was exceedingly severe. The Appellate Division affirmed in a reasoned opinion. *Clark*, 883 N.Y.S.2d at 828.

Clark filed a counseled application for leave to appeal, arguing that: 1) the people improperly relied on a crime that was not before the jury and upon events that occurred after the offenses charged to sustain convictions for felonies that were actually misdemeanors; 2) certain comments by the prosecutor violated his right to silence and right to self-representation; and 3) his consecutive sentences were illegal. Clark additionally submitted a *pro se* application for leave to appeal raising arguments including the following: 1) there was insufficient evidence to support 4 of his convictions; and 2) his sentence was exceedingly severe. The Court of Appeals denied relief.

Clark then filed a *pro se* motion to set aside his sentence pursuant to New York Criminal Procedure Law ("CPL") § 440.20, in which he argued that his prior felony conviction was unconstitutionally obtained and was the result of coercion on the part of his attorney. The trial court denied this claim on the ground that it had been raised and rejected at Clark's sentencing hearing. Clark filed a *pro se* application for leave to appeal the denial of his CPL § 440.20 motion, which the Appellate Division summarily denied.

Clark then filed a *pro se* motion for writ of error coram nobis, claiming that appellate counsel was ineffective for a host of reasons. He claimed, *inter alia*, that appellate counsel was ineffective for failing to raise on direct appeal the claim that the trial court failed to conduct a "searching inquiry" of Clark's request to represent himself. He further claimed that the prosecutor violated due process by shifting the "burden of persuasion" to him. The Appellate Division summarily denied relief.

Clark filed his *pro se* Petition with this Court on July 24, 2011, and Respondent concedes that it is timely.

## II. GROUNDS RAISED

In his Petition before this Court, Clark argues that: 1) certain comments made by the prosecutor during summation violated his right to self-representation and silence; 2) the trial court failed to conduct a "searching inquiry" before granting his motion to proceed *pro se*; 3) the trial court violated various constitutional rights by limiting access to his advisory counsel; and 4) his consecutive sentences were illegal. After filing his Traverse, Clark moved to withdraw all claims but Claim 1. Respondent filed a letter stating it did not oppose the motion. This Court entered an order stating that if Clark did in fact wish to withdraw his 3 remaining claims, he must "clearly notify" the Court. This Court then denied the motion to withdraw after Clark failed to respond after *sua sponte* giving him an extension of time to do so. Accordingly, all claims are addressed below.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

To the extent that the petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

A.   Exhaustion

This Court may not consider claims that have not been fairly presented to the state courts. 28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases). To be deemed exhausted, a claim must have been presented to the highest state court that may consider the issue presented. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In New York, to invoke one complete round of the State's established appellate process, a criminal defendant

must first appeal his or her conviction to the Appellate Division and then seek further review by applying to the Court of Appeals for leave to appeal. *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005). Exhaustion of state remedies requires the Petitioner to fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *Duncan v. Henry*, 513 U.S. 364, 365 (1995). A petitioner must alert the state courts to the fact that he is asserting a federal claim in order to fairly present the legal basis of the claim. *Id.* at 365-66. An issue is exhausted when the substance of the federal claim is clearly raised and decided in the state court proceedings, irrespective of the label used. *Jackson v. Edwards*, 404 F.3d 612, 619 (2d Cir. 2005). Respondent concedes that Clark exhausted his claim that the prosecutor committed misconduct by criticizing his right to remain silent by raising it on direct appeal on federal grounds. However, Clark did not raise on direct appeal his claim that the trial court violated his constitutional rights by allowing him to represent himself or that the trial court impermissibly restricted his right to stand-by counsel.

Because Clark's claims are based on the record, they could have been raised in his direct appeal on federal grounds but were not; consequently, Clark cannot bring a motion to vacate as to these claims. C.L. § 440.10(2)(c) ("[The court must deny a motion to vacate a judgment when[,] [a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal . . . ."). Moreover, Clark cannot

now raise these claims on direct appeal because he has already filed the direct appeal and leave application to which he is entitled. *See Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991).

"[When a 'petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the federal habeas court should consider the claim to be procedurally defaulted." *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (citation omitted); *see also Grey*, 933 F.2d at 121. A habeas petitioner may only avoid dismissal of his procedurally defaulted claims if he can demonstrate "cause for the default and prejudice from the asserted error," *House v. Bell*, 547 U.S. 518, 536 (2006), or a "fundamental miscarriage of justice," *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986), *superceded by statute on other grounds*, *United States v. Gonzalez-Largo*, No. 2:07-cr-0014, 2012 WL 3245522, at *2 (D. Nev. Aug. 7, 2012). A miscarriage of justice is satisfied by a showing of actual innocence. *See Schlup v. Delo*, 513 U.S. 298, 326-27 (1995). Clark does not claim that cause exists for his procedural default. Because Clark may not now return to state court to exhaust these claims, the claims may be deemed exhausted but procedurally defaulted from habeas review. *See Ramirez v. Att'y Gen.*, 280 F.3d 87, 94 (2d Cir. 2001).

Additionally, Clark's challenge to the imposition of consecutive sentences is also unexhausted. He raised this claim for the first time in his application for leave to appeal to the Court of Appeals. Because he raised this claim only in a discretionary leave application, it is unexhausted. *St. Helen v. Senkowski*, 374 F.3d 181, 183 (2d Cir. 2004) ("raising a federal claim for the first time in an application for discretionary review to a state's highest court is

7

insufficient for exhaustion purposes"). However, this claim is not procedurally barred because he can still raise it in a motion to set aside his sentence pursuant to CPL § 440.20.

Despite Clark's failure to exhaust a number of his claims, this Court nonetheless may deny his claims on the merits and with prejudice. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). This is particularly true where the grounds raised are meritless. *See Rhines*, 544 U.S. at 277. Accordingly, this Court declines to dismiss these claims solely on exhaustion grounds and will instead reach the merits of the claims as discussed below.

B.    Merits

Prosecutorial misconduct (Claim 1)

At one point during Clark's cross-examination of the complaining witness, the court sustained the prosecution's objection to a comment made by Clark and reminded him that he "can't testify." Later on in his cross-examination of the same witness, the court *sua sponte* warned Clark that he "can't testify here." Even though he chose not to testify at trial, Clark often included his own version of events in his summation. For example, he claimed that he violated an order of protection because he was "try[ing] to save the relationship." He further claimed he "wasn't stalking" the complaining witness, but was trying to make amends with her. Clark often explained his whereabouts, intent, and actions in summation, even though he had not testified at trial.

In summation, the prosecutor stated as follows:

> This is an opportunity, as we indicated to you at the beginning of trial, for the lawyers, to tell you what they interpret or believe the proof has shown you. As I

indicated, or requested your attention at the beginning of trial to concentrate on evidence. That evidence would be in a number of different forms, but one most important form, and probably the overwhelming source of evidence in this particular trial, is testimony. It's testimony. It's testimony from people who take [an] oath, and they get up on the witness stand and they testify. They're examined, and they're cross-examined. And one thing that I dislike very much in this type of trial is individuals who attempt to testify without taking the witness stand. You're not to consider that. Statements made that are not in evidence, that you didn't hear anything from that witness stand about, are not evidence.

The court overruled Clark's objection, and the prosecutor continued:

I very much dislike that because there is a process and that process is right. One's to be examined and then cross-examined. If they're not willing to take that witness stand and be cross-examined, then they shouldn't be testifying.

Clark first argues in his Petition to this Court that the prosecutor committed misconduct and violated his right to silence and right to self-representation by commenting on his failure to testify. He raised this claim on direct appeal, and the Appellate Division denied him relief on this claim as follows:

Contrary to [Clark's] assertion, [the prosecutor's comments during summation] did not call the jury's attention to [his] failure to testify; rather, the comments refer to [his] conduct in making numerous improper factual assertions while questioning witnesses—despite being repeatedly instructed not to do so—and his subsequent attempts to cite his own assertions as evidence in his summation. Under these circumstances, the comments could not "naturally and reasonably be interpreted by the jury as adverse comment of [Clark's] failure to take the stand."

*Clark*, 883 N.Y.S.2d at 828 (citations omitted).

The Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such evidence is evidence of guilt." *United States v. Robinson*, 485 U.S. 25, 30 (1988) (citation omitted). That is, the judge and prosecutor are prohibited "from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt." *Id.* at 32 (citation omitted). However, not every reference by a prosecutor to a defendant's failure to testify violates the Fifth Amendment. Rather, where "the prosecutor's

9

reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, . . . there is no violation of the privilege [against compulsory self-incrimination]." *Id*. "It is one thing to hold . . . that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence." *Id*. at 34.

Clark's claim that the prosecutor violated his right against self-incrimination is without merit. The prosecutor did not ask the jury to draw an adverse inference from Clark's decision not to testify. Viewing the comments as a whole, the prosecutor asked the jury to decide the case based on evidence, and correctly noted that Clark's rendition of his version of events, motivation, and whereabouts during summation were not evidence because he chose not to subject himself to examination and cross-examination. The prosecution's comments constituted a "fair comment on the evidence" and a "fair response to remarks made by the defense counsel during summation." *Osorio v. Conway*, 496 F. Supp. 2d 285, 301 (S.D.N.Y. 2007) (citation omitted). The Appellate Division's conclusion that the prosecutor's comments did not violate Clark's privilege against self-incrimination was not unreasonable under the circumstances.

Self-representation (Claims 2 and 3)

Clark next argues that the trial court denied him the effective assistance of counsel by allowing him to represent himself at trial. He claims that the trial court failed to conduct a "searching inquiry" of his request to proceed *pro se* and to warn him of the "dangers and disadvantages" of self-representation. He additionally claims that the trial court improperly

denied him access to assigned advisory counsel. Clark failed to exhaust these claims on direct appeal, and his claims are procedurally defaulted. In any event, they are without merit.

"The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all 'critical stages' of the criminal process." *Iowa v. Tovar*, 541 U.S. 77, 87 (2004) (citation omitted). Furthermore, the Sixth Amendment "right to assistance of counsel implicitly embodies a correlative right to dispense with a lawyer's help." *Faretta v. California*, 422 U.S. 806, 835 (1975) (citation and internal quotation marks omitted). "When an accused manages his own defense, he relinquishes, as purely a factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must knowingly and intelligently forgo those relinquished benefits." *Id.* (citation and internal quotation marks omitted). "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Id.* (citation and internal quotation marks omitted). There is "no formula or script to be read to a defendant who states that he elects to proceed without counsel." *Tovar*, 541 U.S. at 88. Rather, the determination of whether a defendant has knowingly and intelligently waived his rights to counsel depends on "a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Id.* In addition, the court must specifically warn a defendant electing to proceed pro se "of the dangers ahead." *Id.* at 88-89.

Clark's first trial resulted in a mistrial, and prior to retrial the Public Defender's Office had to recuse itself based on a conflict of interest. The court represented that it was prepared to assign another lawyer, Mr. Rench, to represent Clark. The court noted, however, that Clark indicated that he wished to proceed *pro se*, and held a hearing on the matter. The court advised Clark that Mr. Rench was very experienced and had a "very high reputation for his ability." Clark indicated that he understood, but still wanted to proceed *pro se*:

> Your Honor, I've weighed all the information that I feel is pertinent in regard to an assigned lawyer and myself; and granted I have never gone to law school, . . . I believe that I'm just as intelligent as counsel that would be assigned to me; and for that reason, intelligent enough to make the proper choices in regards to the trial, and I feel that I can do just as good a job as any assigned counsel. There may be some things that possibly they've had more experienced in in regards to the trial, but as your Honor is fully aware, I've sat through a trial before, so I know courtroom decorum, I know what is supposed to take place. I've always been respectful in front of your Honor. And there are pros and cons, naturally, to a Defendant representing himself, but I feel that I'm entering into this matter with my eyes fully opened, and I feel that the pros far outweigh the cons of self-representation.

The court indicated that it had a "lot of questions" for Clark, and elicited the following information: Clark was 44 years old, had never been treated for any mental or physical condition that affected his ability to understand, had graduated high school and completed a semester of college, had worked from the time he was 15 until the time of his incarceration, and his primary profession was to own, train, and drive harness horses, although he also worked in construction. The court informed Clark that he was charged with a 17-count indictment, and asked if he understood the charges against him. Clark indicated that he did and that he was familiar with the charges because he had just been through trial which resulted in a mistrial. The court asked Clark to describe in his own words the difference between the function of the court and the function of a jury. The court informed Clark that he would be required to abide by the rules of

12

evidence despite the fact that he would be proceeding *pro se*, and Clark stated that he understood. Clark assured court that he would be able to perform jury selection and opening and closing statement and that he would be able to navigate questions about relevance and principles of law. Clark further stated that he understood that the prosecutor had gone to law school, was trained in the law, had tried cases before, and was an experienced attorney. Clark assured the court that he did not feel that this would be a disadvantage. The court concluded that based on Clark's answers, it had no basis to deny his request to represent himself. The court *sua sponte* also assigned Mr. Rench as stand-by counsel, but advised Clark that he could not have "hybrid representation." The court stated, "[y]ou can't do half the trial and let Mr. Rench do the other half of the trial. If you go *pro se*, you do it all the way. . . . If you have any questions about the law, Mr. Rench would be there to answer those questions for you; but after they're answered, then you have to proceed on your own."

Although Clark was charged in a multi-count indictment, many of the charges overlapped and, as Clark indicated, he had sat through the initial trial on the charges, which resulted in a mistrial. The court rigorously advised Clark of the dangers and pitfalls of proceeding *pro se*. Clark unequivocally and repeatedly stated that he had both the ability and wherewithal to defend himself, and was articulate in his responses. He had a high school education and continuous employment history, and indicated that he did not have any physical or mental problems which would impair his ability to proceed *pro se*. Clark indicated that he understood what was expected of him, that jury selection was an art and that he would be expected to abide by the rules of evidence. Under these circumstances, Clark's waiver of his right to counsel was knowing and intelligent and the trial court did not unconstitutionally permit him to defend

13

himself at trial. *Cf. Faretta*, 422 U.S. at 835 (trial court deprived defendant of his constitutional right to defend himself where defendant clearly and unequivocally declared that he wanted to represent himself, was literate, competent, and understanding). Moreover, the court mitigated any problems Clark might encounter by appointing counsel to assist him as needed.

Clark additionally claims that the trial court denied him the "effective assistance of advisory counsel" by putting certain limits on how he could use advisory counsel. The Supreme Court has held, however, that "*Faretta* does not require a trial judge to permit 'hybrid' representation." *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984). Rather, the Supreme Court has cautioned that "excessive involvement by [stand-by] counsel will destroy the appearance that the defendant is acting *pro se*. This, in turn, may erode the dignitary values that the right to self-representation is intended to promote and may undercut the defendant's presentation to the jury of his own most effective defense." *Id.* at 181-82. Thus, the trial court's prohibition of hybrid representation by stand-by counsel was not contrary to federal law. And a review of the record indicates that although the court prevented Mr. Rench from essentially live-feeding Clark his defense, the court likewise allowed Clark to confer with Mr. Rench whenever he needed to. Mr. Rench was permitted to advise Clark freely, but could not perform the trial by proxy. Nothing in the trial court's approach deprived Clark of his right to the effective assistance of counsel.

Consecutive sentence (Claim 4)

Finally, Clark argues that the trial court illegally imposed consecutive sentences on his four first-degree criminal contempt convictions.

Clark failed to exhaust this claim, and accordingly it is procedurally defaulted. Moreover, federal habeas relief is not available for state law errors that do not amount to federal

14

constitutional violations. *See Estelle*, 502 U.S. at 67-68. A challenge to the imposition of consecutive sentences fails to present an issue of constitutional dimension if the sentence falls within the range prescribed by state law. *See White v. Keane,* 969 F.2d 1381, 1383 (2d Cir. 1992). Here, Clark's sentence falls within the range prescribed by New York state law. New York Penal Law § 70.25(2) gives the trial court the discretion to impose consecutive sentences where the facts establish that the acts underlying the crime are separate and distinct. The four counts of first-degree contempt which Clark challenges stemmed from four separate phone calls he made to the complaining witness in violation of an order of protection. His remaining two first-degree criminal contempt counts as well as the second-degree stalking counts concerned a course of conduct over a specified period of time and were properly ordered to run concurrently with his other convictions. Clark thus cannot prevail on his claim that his consecutive sentences were illegal.

## V. CONCLUSION AND ORDER

Clark is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.  *See* FED. R. APP. P. 22(b); 2D CIR. R. 22.1.

The Clerk of the Court is to enter judgment accordingly.

Dated: June 9, 2014.

/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge